# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

STEVEN GABRIEL                *

Plaintiff                      *

v.                             *         Civil Action No. JKB-16-471

CASE MANAGER DeVORE, *et al*.    *

Defendants                  *
                                 ***

## MEMORANDUM

In response to the above-entitled civil rights complaint, defendants filed a motion to dismiss or for summary judgment. ECF 49. Plaintiff opposes the motion. ECF 52 and 55. The court finds a hearing in this matter unnecessary. *See* Local Rule 105.6 (D. Md. 2016). For the reasons stated below, defendants' motion, construed as a motion for summary judgment,[1] shall be granted. Plaintiff's motions for summary judgment (ECF 19) and for appointment of counsel[2] (ECF 53) shall be denied.

## Background

Plaintiff Steven Gabriel, who was, at all times relevant to the complaint, incarcerated at Roxbury Correctional Institution (RCI) and Western Correctional Institution (WCI),[3] claims that his personal safety was endangered by the named defendants when they did not take action to

---

[1] Defendants' dispositive submission will be treated as a motion for summary judgment under Federal Rule of Civil Procedure 56 because materials outside the original pleadings have been considered. *See Bosiger v. U.S. Airway*s, 510 F.3d 442, 450 (4th Cir. 2007).

[2] A federal district court judge's power to appoint counsel under 28 U.S.C. § 1915(e)(1) is a discretionary one, and may be considered where an indigent claimant presents exceptional circumstances. *See Cook v. Bounds*, 518 F.2d 779, 780 (4th Cir. 1975); *see also Branch v. Cole*, 686 F.2d 264, 266 (5th Cir. 1982). Upon careful consideration of the motions and previous filings by plaintiff, the court finds that he has demonstrated the wherewithal to either articulate the legal and factual basis of his claims himself or secure meaningful assistance in doing so. No hearing is necessary to the disposition of this case and there are no exceptional circumstances that would warrant the appointment of an attorney to represent plaintiff under § 1915(e)(1).

[3] While this case was pending, plaintiff was released. *See* ECF 60 (change of address).

protect him from the violence of other inmates after he told them he was being threatened. While incarcerated at RCI, plaintiff states he was stabbed by another inmate and, as a result, he was transferred to WCI. Upon his arrival at WCI on December 7, 2015, plaintiff claims he told Case Manager DeVore he had enemies at WCI and asked for a transfer to another prison. Plaintiff alleges that DeVore ignored the claim. ECF 1 at p. 4.

Plaintiff claims that over the course of his incarceration he was assaulted "at least 13 times" at the direction of the Black Guerilla Family ("BGF"). ECF 10 at p. 3. He notes, in particular, assaults occurring in August of 2011 and on July 26, 2015. *Id*. Plaintiff asserts that due to an incident at RCI, where drones were used to smuggle contraband into the prison, many RCI inmates were transferred to WCI where he was transferred. ECF 26-1. Thus, his transfer to WCI did not effectively remove him from the threat that existed to his safety at RCI, where he was stabbed. *Id*. Plaintiff does not identify anyone in particular who threatened him.

On December 14, 2015, plaintiff claims that while he was walking to the cafeteria at WCI, he was assaulted but fled his assailant. He states he ran into Lt. Millin[4] and told him about the assault. Millin then put plaintiff on administrative segregation where he remained until January 6, 2016, when he claims he was "released" without a hearing. ECF 1 at p. 4.

Plaintiff asserts that on January 12, 2016, he informed correctional officers R. Barnes and R. Hughes and Sgt. Broadwater that he feared returning to general population. In response, plaintiff states he was given a notice of infraction ("ticket") for violation of Rule 401 (prohibiting inmates from refusing housing assignments). ECF 1 at p. 4. Plaintiff adds that Barnes, Hughes, and Broadwater subjected him to verbal abuse, including racial slurs, and assigned him to a cell in the same housing unit he was in prior to being placed on administrative

---

[4]     Defendants identify this party as Lt. Miller.

segregation.  ECF 10 at p. 5.  As a result of this action, plaintiff claims he suffered emotional distress because he felt helpless and suicidal.  *Id.*

Plaintiff also attempted to document his concerns regarding his safety by filing administrative remedy procedure complaints ("ARP").   He expressed concern that his assignment to general population would not be safe for him because he was being targeted by the BGF, but his ARPs were dismissed because "case management decisions" regarding housing are not a subject that may be raised in an ARP.  ECF 1-1 at pp. 1 – 5.

While the instant case was pending, plaintiff claimed that he was denied writing and legal materials and hygiene items, despite his indigency which entitled him to these items free of charge.  ECF 23 at p. 2.  In response to plaintiff's request to the prison library for legal materials, it was noted that his privileges were suspended because he had an overdue book.  ECF 23-1 at pp. 1 – 2.  Plaintiff claimed, however, he had returned the books over two weeks before the suspension of his privileges and opines that since inmate workers handle the type of books returned ("recreational novels"), a mistake was made.  ECF 23 at p. 2.  Plaintiff further asserts that overdue books were not a legitimate reason to deny his requests for legal materials.  *Id.*, *see also* ECF 28.

With regard to defendants Sgt. T. Menges and Officer A. Cartwright, plaintiff claims that his ARP complaints regarding officers' misconduct and others submitted as emergency requests were mishandled, inappropriately dismissed, or simply never processed.  ECF 23 at p. 3.  Menges and Cartwright are the ARP coordinators for WCI.  *Id.*   He states that referral of his ARPs that concerned officer misconduct should have been referred to the Internal Investigations Unit (IIU) for handling, but were not.  Plaintiff claims that ARPs are not addressed by prison

staff because they believe it is the courts' job to handle the claims and states that, had the ARPs been taken more seriously, he might not have suffered so many injuries. *Id.*

In an ARP dated February 29, 2016, plaintiff complained that he was housed in a cell with no electricity, was denied commissary and phone privileges, and had only limited access to his personal property. ECF 23-1 at p. 3. Plaintiff further stated in the ARP that he was being denied the privileges afforded to administrative segregation inmates despite the fact that his disciplinary segregation term had ended on February 25, 2016. *Id.* The procedural dismissal of the ARP includes a handwritten notation from Menges stating, "[i]nformation from courts advising case management to keep you in your current housing location." *Id.* Plaintiff appealed this dismissal to the Commissioner of Correction, noting that he had a copy of the court order and it required his placement on administrative segregation, not the denial of privileges. *Id.* at p. 4. The Commissioner's office remanded the matter back to the institution, noting that he did not concur with the rationale for the procedural dismissal. *Id.* at p. 5 (memorandum dated March 9, 2016). Plaintiff states the Commissioner ordered his removal from disciplinary segregation as a result of the remand. ECF 26 at p. 1.

Plaintiff claims that Officer M. Davis retaliated against him for the appeal of the ARP to the Commissioner that resulted in his removal from disciplinary segregation and for filing the instant case. ECF 26 at p. 1. Plaintiff claims that Davis lied in order to keep him confined to disciplinary segregation and issued a notice of infraction to plaintiff on March 11, 2016. *Id.* The infraction charges plaintiff with use of threatening language (Rule 104), interference with the performance of staff duties (Rule 312), use of disrespectful or vulgar language (Rule 405), and destruction of State property (Rule 408). ECF 23-1 at p. 6. Davis's narrative of the incident relates that he was returning plaintiff's property to him and when he handed plaintiff the

inventory sheet, told him "if all of your belongings are there, sign the sheet." *Id*. According to

Davis, plaintiff signed the inventory sheet and then claimed he was missing a pair of shoes. *Id*.

When Davis checked the paperwork, he saw that plaintiff was not missing shoes and informed

him that the paperwork did not indicate that anything was missing. *Id*. Davis states that,

> Inmate Gabriel then became very agitated and ripped up the inventory sheet
> which destroyed state property. I immediately gave him a direct order to stop
> ripping up the sheet but he did not stop. Inmate Gabriel then stated, "I'm tired
> of fucking with these bitches up here. I'm gonna have to stab one of those
> mother fucking officers in Housing Unit 5 for stealing my shoes and fucking
> with my property." I immediately removed myself from the tier due to his
> agitated state.

*Id*.

Plaintiff was placed on "staff alert" status as a result of his encounter with Davis which

involved assignment to a cell without bedding. ECF 26 at p. 2. Plaintiff claims this assignment

was unnecessary as he did not threaten Davis, nor was any force involved as plaintiff remained

handcuffed during the incident. *Id*. at pp. 1 – 2. He claims that the isolation cell was unsanitary

because it had "dried feces smeared across the walls and into the steel mesh that covers the glass

and window fixtures" and contained mice and bugs. *Id*. at p. 2. Plaintiff alleges he was confined

to the cell for three full days without a mattress or a bunk; was only permitted boxer shorts and a

t-shirt for clothing; and was denied legal mail, writing materials, soap, toilet paper, showers, and

hygiene items. *Id*. During the time plaintiff was confined to the isolation cell, he claims he did

not receive his asthma medication and states the temperature in the cell was "freezing." *Id*.

Plaintiff further explains that he was provided only a "paper diet," meaning he was not permitted

either plastic utensils for eating or liquid beverages, and his food items were wrapped in wax

paper. *Id*. Plaintiff characterizes the conditions under which he was confined as punishment that

was imposed without due process of law. *Id*. In a later-filed supplemental pleading, plaintiff

states that during his confinement to the isolation cell his "medications had to be increased twice." ECF 33-2 at p. 2. Plaintiff also states, however, that Lt. Smith denied him the use of a prescribed inhaler for asthma while confined to the cell. *Id.*

In addition to the alleged retaliatory conduct, plaintiff claims that Davis also "mussed" his head "into a wall while handcuffed." ECF 26 at p. 3. He further alleges that Davis conducted a strip search on plaintiff in the presence of a female nurse and repeatedly made him "bend at the waist and spread my cheeks." *Id.* Plaintiff states that he did not receive the notice of infraction written by Davis until he was removed from staff alert status and that the experience caused him to experience nightmares and paranoia. *Id.*

Plaintiff's claim against Chief of Psychology Ronald S. Weber is based on his allegation that Weber refused to provide needed services to plaintiff because of this pending litigation. ECF 26 at p. 4. Plaintiff alleges he informed Weber of "serious depression issues," including suicidal ideation, and that he asked for a referral for therapy sessions and evaluation for anti-depressant medication. *Id.* He further states that he has "been diagnosed with anxiety, bi-polar and depression in the past." *Id.* In the supplemental complaint dated April 10, 2016, plaintiff states that he "recently tried to hurt [him]self" and that he had "just returned from 'suicide watch.'" *Id.* He alleges his mental status was adversely affected by his confinement to a cell in disciplinary segregation for over 120 days where he was confined alone. *Id.* Notwithstanding the symptoms alleged, plaintiff claims Weber refused to provide him with the services requested. *Id.* Plaintiff adds, in a supplemental pleading, that Weber was informed that plaintiff "could become a threat to [him]self," but he remained confined in segregation. ECF 35 at p. 1. Plaintiff admits he met with Weber "a few times," but claims most of his requests were ignored or took 10 to 14 days to respond. *Id.* Plaintiff asserts that the few times he met with Weber in his office

do not qualify as treatment because plaintiff was simply asked to explain his request and told by Weber to work on his behavior before plaintiff was dismissed from his office. *Id.*

Plaintiff further claims that while he was confined to disciplinary segregation the use of chemical agents was a common occurrence on the tier and it caused him to suffer asthma attacks. ECF 35 at p. 2. Specifically, he states that on April 10, 2016, during the 8 a.m. to 4 p.m. shift at lunch time, chemical agent was deployed in another cell, causing him to choke and gag for approximately three hours. *Id.* Plaintiff states he received no assistance during the asthma attack, despite "scream[ing] out of [his] cell door" to an unknown correctional officer, requesting assistance or a respirator mask. *Id.* He further states that he "used dangerous amounts of [his] inhaler" before stabilizing. *Id.*

On April 14, 2016, plaintiff states that another incident involving use of chemical agents on the tier occurred during the time when showers were being provided. ECF 35 at pp. 2 – 3. Plaintiff states he exited his cell for his shower wearing a shirt tied around his face, covering his nose and mouth to protect against exposure to the agent, but an unknown correctional officer "snatched the thermal top from [his] face." *Id.* at p. 3. Plaintiff states the presence of chemical agent was strong enough to affect people in other parts of the building and that officers and inmate workers in different wings were choking and coughing. *Id.*

On April 22, 2016, chemical agents were again deployed four doors down from plaintiff's cell and plaintiff states he was denied medical care and access to a paper respirator mask worn by officers. ECF 35 at p. 3. He states that officers are aware of his asthmatic condition because it is documented and during the incident he was gagging and choking on his own saliva. *Id.* When he asked Officers Cooter and Davis for assistance, Davis responded that

plaintiff should "write it up, tell the damn courts to help you."  *Id*.  During this incident, plaintiff states he did not have any medications or inhalers to assist him.  *Id*.

Plaintiff claims that additional retaliatory measures were taken against him on May 9, 2016, when defendants removed him from housing unit 4.  ECF 38 at p. 1.  Plaintiff maintains that this court ordered defendants to keep him on housing unit 4, but he was forced from administrative segregation and placed into general population on housing unit 3.  He states that housing unit 3 is known as "gang land" among inmates because the most troubled inmates at WCI are housed there and it is designated as the housing unit for inmates who have returned to general population following removal from disciplinary segregation.  While plaintiff was housed there, he states he was assaulted and robbed by his cellmate, causing a "noticeable gash under [plaintiff's] left eye."  *Id*.  Plaintiff's requests for medical assistance and to have his property inventoried, to establish that some was stolen, were denied by the housing unit tier officers.  *Id*. at p. 2.  Plaintiff claims that "during the altercation" his pants were torn, video game system was knocked over, television screen was broken, and "several property items" were stolen at knife point.  *Id*.  Following this incident, plaintiff was moved back to housing unit 5 where he claimed to suffer continuous mistreatment in retaliation for the instant case.  *Id*.

<u>Injunctive Relief</u>

On February 19, 2016, this court partially granted plaintiff's request for injunctive relief, directed counsel to show cause why permanent injunctive relief should not be granted, and directed counsel to insure that plaintiff's assignment to administrative segregation remained unchanged until otherwise ordered by this court.  ECF 4.  In their response to show cause, defendants acknowledge that plaintiff was assaulted by an unknown assailant at RCI on July 26, 2015, and state that plaintiff refused to provide a statement regarding the identity of his assailant.

ECF 9 at Ex. 1, pp. 5 – 6. On July 29, 2015, an administrative segregation review was conducted and a decision was reached to maintain plaintiff in that housing assignment until he could be transferred to another medium security prison. *Id*. at p. 3.

On November 30, 2015, plaintiff was transferred to WCI and met with his case manager on December 2, 2015. At this initial meeting, defendants allege plaintiff refused to sign any paperwork because he "shouldn't be here." ECF 9 at Ex. 1, p. 8. Plaintiff remained in general population until December 14, 2015, when he was placed on administrative segregation following his claim his life was in danger. *Id*. at pp. 9 – 10. Because an investigation into plaintiff's allegations could not substantiate his claim that he was being targeted by a prison gang, it was recommended that he be returned to general population. Plaintiff either could not or would not identify any particular person who presented a threat to him, nor could he provide a plausible reason that would explain why the BGF had a "hit" out on him.

Plaintiff has since been released from prison. *See* ECF 60 (notice of change of address). His request for injunctive relief is therefore moot. A case becomes moot when the issues presented are "no longer 'live' or the parties lack a legally cognizable interest in the outcome." *City of Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000) (quoting *Los Angeles County v. Davis*, 440 U.S. 625, 631 (1979)). Where injunctive or declaratory relief is requested in an inmate's complaint, it is possible for events occurring subsequent to the filing of the complaint to render the matter moot. *See Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991) (transfer of prisoner moots his Eighth Amendment claims for injunctive and declaratory relief); *see also Slade v. Hampton Rds. Reg'l Jail*, 407 F.3d 243, 248–49 (4th Cir. 2005) (pre-trial detainee's release moots his claim for injunctive relief); *Magee v. Waters*, 810 F.2d 451, 452 (4th Cir. 1987) (holding that the transfer of a prisoner rendered moot his claim for injunctive relief).

To the extent plaintiff argues that his claim is capable of repetition but evades review, the possibility of his future incarceration does not constitute a basis for making that conclusion. This court may not engage in speculative decisions or render judgments that are based on mere possibilities that circumstances may exist in the future, provided several contingencies come to fruition. Thus, plaintiff's request for injunctive relief is denied and his claim for monetary damages is considered below.

<u>Standard of Review</u>

Summary judgment is governed by Rule 56(a), which provides in part:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986).

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc*., 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting former Fed. R. Civ. P. 56(e)). The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witnesses' credibility." *Dennis v. Columbia Colleton Med*. *Ctr., Inc*., 290 F.3d 639, 644-45 (4th Cir. 2002). Because plaintiff is self-represented, his submissions are liberally construed. *See Erickson v.*

*Pardus*, 551 U.S. 89, 94 (2007).  But, the court must also abide by the "'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'" *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993), and citing *Celotex Corporation v. Catrett*, 477 U.S. 317, 323–24 (1986)).

Inmates are required to exhaust "such administrative remedies as are available" before filing an action. 42 U.S.C. § 1997e(a).  *See Ross v. Blake*, _ U.S._, 136 S. Ct. 1850, 1858 (2016) (An inmate "must exhaust available remedies, but need not exhaust unavailable ones.").  This requirement is one of "proper exhaustion."  *Woodford v. Ngo*, 548 U.S. 81, 93 (2006). "[A]n administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it."  *Moore v. Bennette,* 517 F.3d 717, 725 (4th Cir. 2008).

Exhaustion is mandatory.  *Ross*, 136 S. Ct. at 1857, *Jones v. Bock*, 549 U.S. 199, 219 (2007).  A court may not excuse a failure to exhaust.  *Ross*, 136 S. Ct. at 1856 (citing *Miller v. French*, 530 U.S. 327, 337 (2000) (explaining "[t]he mandatory 'shall' . . . normally creates an obligation impervious to judicial discretion")).  The purpose of exhaustion is to 1) allow a prison to address complaints about the program it administers before being subjected to suit; 2) reduce litigation to the extent complaints are satisfactorily resolved; and 3) prepare a useful record in the event of litigation.  *Jones,* 549 U.S. at 219.  An inmate's failure to exhaust administrative remedies is an affirmative defense; defendant bears the burden of proving that the inmate had available to him remedies of which he failed to take advantage.  *Jones*, 549 U.S. at 211–12, 216; *Moore*, 517 F.3d at 725**.**

In *Ross v. Blake*, 136 S. Ct. 1850 (2016), the Supreme Court of the United States identified three kinds of circumstances in which an administrative remedy is unavailable. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* at 1859. Second, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use. In this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it." *Id.* The third circumstance arises when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.*

In Maryland, filing a request for administrative remedy ("ARP") with the warden of the prison is the first of three steps in the ARP process. *See* Code of Md. Regs. ("COMAR"), tit. 12 § 07.01.04. The ARP request must be filed within 30 days of the date on which the incident occurred, or within 30 days of the date the inmate first gained knowledge of the incident or injury giving rise to the complaint, whichever is later. COMAR, tit. 12 § 07.01.05A. If the request is denied, a prisoner has 30 calendar days to file an appeal with the Commissioner of Correction. COMAR, tit. 12 § 07.01.05C. If the appeal is denied, the prisoner has 30 days to file a grievance with the Inmate Grievance Office. *See* Md. Code Ann., Corr. Servs. §§ 10-206, 10-210; COMAR, tit. 12 §§ 07.01.03 and 07.01.05B.

Complaints are reviewed preliminarily by the Inmate Grievance Office ("IGO)"). *See* Md. Code Ann., Corr. Servs. § 10-207; COMAR, tit. 12 § 07.01.06A. If a complaint is determined to be "wholly lacking in merit on its face," the IGO may dismiss it without a hearing. Md. Code Ann., Corr. Servs. § 10-207(b)(1); *see* COMAR, tit. 12 § 07.01.07B. The order of dismissal constitutes the final decision of the Secretary of DPSCS for purposes of judicial

review.  Md. Code Ann., Corr. Servs. § 10-207(b)(2)(ii).  However, if a hearing is deemed necessary by the IGO, the hearing is conducted by an administrative law judge from the Maryland Office of Administrative Hearings.  *See* Md. Code Ann., Cts. & Jud. Proc. § 10-208(c); COMAR tit. 12 § 07.01.07-.08.  The conduct of such hearings is governed by statute. *See* Md. Code Ann., Corr. Servs. § 10-208.

A decision of the administrative law judge denying all relief to the inmate is considered a final agency determination.  However, a decision concluding that the inmate's complaint is wholly or partly meritorious constitutes a recommendation to the Secretary of DPSCS, who must make a final agency determination within fifteen days after receipt of the proposed decision of the administrative law judge.  *See* Md. Code Ann., Corr. Servs. § 10-209(b)-(c).

The final agency determination is subject to judicial review in Maryland State court, so long as the claimant has exhausted his/her remedies.  *See* Md. Code Ann., Corr. Servs. § 10-210. An inmate need not seek judicial review in State court in order to satisfy the PLRA's administrative exhaustion requirement.  *See, e.g.*, *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002) ("[A] prisoner who uses all administrative options that the state offers need not also pursue judicial review in state court.").

Each of plaintiff's numerous claims must have been exhausted prior to filing suit in this court.  Defendants assert that this did not occur, but concede some of plaintiff's claims were submitted for processing through the administrative grievance procedure.  ECF 49.  Plaintiff contends that his efforts to exhaust were thwarted by improper dismissals and interference with his access to appropriate forms.  ECF 52 at pp. 14 - 16.  Each claim is addressed below with regard to both exhaustion and the merits.

Analysis

1. Failure to Protect

In order to prevail on an Eighth Amendment claim of failure to protect from violence, Plaintiff must establish that Defendants exhibited deliberate or callous indifference to a specific known risk of harm.  *See Pressly v. Hutto*, 816 F.2d 977, 979 (4th Cir. 1987).  "Prison conditions may be 'restrictive and even harsh,' but gratuitously allowing the beating or rape of one prisoner by another serves no legitimate penological objective, any more than it squares with evolving standards of decency.  Being violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society."  *Farmer v. Brennan*, 511 U.S. 825, 833-34 (1994) (citations omitted).  "[A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Id.* at 837, *see also Rich v. Bruce*, 129 F.3d 336, 339-40 (4th Cir. 1997).

"The Eighth Amendment's prohibition on cruel and unusual punishments imposes certain basic duties on prison officials."  *Raynor v. Pugh*, 817 F.3d 123, 127 (4th Cir. 2016) (citing *Farmer*, 511 U.S. at 832).  Those duties "include maintaining humane conditions of confinement, including the provision of adequate medical care and . . . 'reasonable measures to guarantee the safety of the inmates.'"  *Id.*  "[N]ot every injury suffered by a prisoner at the hands of another 'translates into constitutional liability for prison officials responsible for the victim's safety.'"  *Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015).  A two-part inquiry that includes

both an objective and a subjective component must be satisfied before liability is established. *See Raynor*, 817 F.3d at 127.

Objectively, the prisoner "must establish a serious deprivation of his rights in the form of a serious or significant physical or emotional injury" or substantial risk of either injury. *Danser v. Stansberry*, 772 F.3d 340, 346–47 (4th Cir. 2014). The objective inquiry requires this Court to "assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk." *Helling v. McKinney*, 509 U.S. 25, 36 (1993). A genuine dispute of fact regarding the extent of the injury suffered precludes summary judgment. *Raynor*, 817 F.3d at 128.

Subjectively, a plaintiff must establish that the prison official involved had "a sufficiently culpable state of mind" amounting to "deliberate indifference to inmate health or safety." *Farmer*, 511 U.S. at 834. Evidence establishing a culpable state of mind requires actual knowledge of an excessive risk to the prisoner's safety or proof that prison officials were aware of facts from which an inference could be drawn that a substantial risk of serious harm exists and that the inference was drawn. *Id.* at 837. A plaintiff may "prove an official's actual knowledge of a substantial risk 'in the usual ways including inference from circumstantial evidence'" so that "'a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.'" *Raynor*, 817 F.3d at 128.

Actual knowledge of a substantial risk does not alone impose liability. Where prison officials responded reasonably to a risk, they may be found free of liability. *Farmer*, 511 U.S. at 844. "In failure to protect cases, prison guards have no constitutional duty to intervene in the armed assault of one inmate upon another when intervention would place the guards in danger of physical harm." *Raynor*, 817 F.3d at 128 (internal quotation marks omitted) (quoting *Prosser v.*

*Ross*, 70 F.3d 1005, 1008 (8th Cir. 1995)).   Failure to take any action in an ongoing assault,

however, can amount to deliberate indifference.   *See Winfield v. Bass*, 106 F.3d 525, 532 (4th

Cir. 1997).

Plaintiff filed numerous ARP complaints regarding his housing assignment and its impact

on the alleged threats to his safety.   The responses to those complaints were almost invariably a

procedural dismissal because housing assignments involve case management decisions that are

not addressed through the ARP; rather, case management decisions are to be addressed directly

to the IGO.   *See* ECF 49 at Ex. 4, pp. 101-13 (Executive Directive, OPS.185.0002).   Defendants

assert that plaintiff filed multiple grievances with the IGO concerning his need for protection, but

the IGO did not reach a decision concerning any of these grievances before plaintiff filed the

instant complaint.   ECF 49 at Ex. 5.   Defendants further assert that the IGO could not make a

substantive decision concerning this issue because plaintiff did not provide requested paperwork

to the IGO.   *Id.*   Plaintiff claims that the requested paperwork was not available to him and that,

in any event, the IGO should have held a hearing where the paperwork could have been

produced.   Plaintiff is responsible for *properly* exhausting administrative procedures and his

failure to do so *prior* to filing suit in this court is fatal to his claims in the absence of evidence

that the procedures were not made available or were so inscrutable as to be unavailable.

Plaintiff's assertion that requiring him to provide additional paperwork is beyond his ability is

belied by the numerous attachments provided with the pleadings filed in this case.   On the other

hand, the responses provided to many of the ARPs he filed regarding his personal safety appear

to deliberately misconstrue the issue as a case management decision not amenable to resolution

through the ARP.   Given this dispute regarding the availability of the administrative procedures,

this claim regarding failure to protect plaintiff from violence is deemed exhausted and the merits are addressed below.

The risk articulated by plaintiff was that there was a general vendetta against him that emanated from a security threat group, but he never provided any basis for that allegation to prison officials or in this court; nor did he provide the identity of any individual person who had threatened him.   Indeed, even after plaintiff was stabbed at RCI he provided no information regarding his assailant.   ECF 49, Ex. 2, p. 6.   He appears to maintain that his allegations alone warranted his placement in administrative segregation for his protection.   *See* ECF 52 at p. 4 ("the fact that they didn't believe me isn't any excuse.").

Defendant DeVore denies that plaintiff told him his safety was at risk upon his arrival at WCI on December 7, 2015.   ECF 49 at Ex. 1.   DeVore further states that there were no enemies listed for plaintiff in his prison file and that when plaintiff was presented with paperwork to sign, he refused to sign it and muttered something about contacting his attorney.   *Id.*, *see also* Ex. 4, p. 16 (case note dated December 7, 2015).   Plaintiff claims that DeVore's statement that plaintiff had no enemies listed contradicts DeVore's assertion he was not told about a threat.   ECF 52 at pp. 1-2.   That claim is without merit; DeVore's job duties include checking for documented enemies for inmates newly arriving at WCI; in plaintiff's instance, none were noted.

In his declaration under oath, Defendant Barnes states that on January 12, 2016, he was ordered, along with Sgt. Broadwater and Officer Hughes,[5] to move plaintiff from administrative segregation to general population.   ECF 49 at Ex. 3, p. 1.   Barnes further states that he did not participate in the decision to remove plaintiff from administrative segregation and that when plaintiff refused the housing assignment, he was given a notice of infraction.   *Id.*   He denies being verbally abusive or witnessing verbal abuse by Broadwater or Hughes.   *Id.*   Barnes further

---

[5]        Broadwater and Hughes did not provide statements under oath.

states that there was nothing other than plaintiff's "own say-so" that he was being threatened and that he had no knowledge of any such threats. *Id*. at p. 2.

All efforts to investigate plaintiff's allegations failed to reveal any basis in fact for his fears. *See* ECF 49 at Ex. 2, p. 2. While prison officials are charged with maintaining a safe prison environment, they are not guarantors of such an environment and have the additional obligation to insure that only those prisoners who have a legitimate need for added safety through assignment to a higher-maintenance form of confinement receive it. If unverified threats were to become the standard for requiring additional protection, then management of the prison population would become unworkable. The very real danger of such a practice would be to allow the manufacture of baseless claims and imposition of liability where none should exist. On the undisputed facts before this court, defendants are entitled to summary judgment on this claim.

## 2. Retaliation

In order to prevail on a claim of retaliation, Plaintiff "must allege either that the retaliatory act was taken in response to the exercise of a constitutionally protected right or that the act itself violated such a right." *Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994). It is unclear how much of a showing of adversity must be made in order to survive a motion for summary judgment. *See Burton v. Livingston*, 791 F.2d 97, 100-01 (8th Cir. 1986) ("complaint that a prison guard, without provocation, and for the apparent purpose of retaliating against the prisoner's exercise of his rights in petitioning a federal court for redress, terrorized him with threats of death" sufficient to state claim). "A complaint which alleges retaliation in wholly conclusory terms may safely be dismissed on the pleading alone." *Gill v. Mooney*, 824 F.2d 192, 194 (2d Cir. 1987) (quoting *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983)); *Pierce v.*

*King*, 918 F. Supp. 932, 945 (E.D.N.C. 1996) (conclusory allegations of retaliation insufficient to state claim), *judgment vacated on other grounds*, 525 U.S. 802 (1998).

> Retaliation, though it is not expressly referred to in the Constitution, is nonetheless actionable because retaliatory actions may tend to chill individuals' exercise of constitutional rights. *Perry v. Sindermann*, 408 U.S. 593, 597 (1972). Where there is no impairment of the plaintiff's rights, there is no need for the protection provided by a cause of action for retaliation. Thus, a showing of adversity is essential to any retaliation claim.

*ACLU of Md., Inc. v. Wicomico Cty, Md.*, 999 F.2d 780, 785 (4th Cir. 1993).

"In the prison context, we treat such claims with skepticism because '[e]very act of discipline by prison officials is by definition 'retaliatory' in the sense that it responds directly to prisoner misconduct.'" *Cochran v. Morris*, 73 F.3d 1310, 1317 (4th Cir. 1996) (quoting *Adams v. Rice*, 40 F.3d 72, 74 (4th Cir. 1994)). Plaintiff "[b]ears the burden of showing that the conduct at issue was constitutionally protected and that the protected conduct was a substantial or motivating factor in the prison officials' decision." *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996); *see also Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977). In the prison context, Plaintiff must establish that the prison authorities' retaliatory action did not advance legitimate goals of the correctional institution or was not narrowly tailored to achieve such goals. *Rizzo v. Dawson*, 778 F.2d 527, 532 & n.4 (9th Cir.1985). The preservation of internal order and discipline constitutes a legitimate goal of the correctional institution. *Id*. at 532. After Plaintiff makes a prima facie showing, the burden shifts to defendants to demonstrate that they would have reached the same decision even in the absence of plaintiff's constitutionally protected conduct. *Mt. Healthy*, 429 U.S. at 287.

Plaintiff admits that he did not attempt to address his claims of retaliation through the administrative remedy procedure because it made sense to him to simply address it in the context

of this case.  ECF 52 at p. 16.  The claims are not exhausted and are subject to dismissal in light of this admitted failure.  Notwithstanding that failure, the claim does not meet the standards noted for a cognizable claim.  Plaintiff's assertions that the notice of infraction and his subsequent assignment to "staff alert" status were erroneous because he did not threaten the officer who was present amounts to form over substance.  The conduct alleged was a legitimate basis for the actions taken, thereby vitiating any claim that it was retaliation for the filing of the instant claim.  Additionally, defendants have offered other legitimate causes for denying plaintiff's access to some of his property, and plaintiff admits that the denial of his request for legal materials was based on a mistaken belief he had not turned in a book in a timely manner.  Defendants are entitled to summary judgment on the claim of retaliation.

3.  Denial of Medical Care

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment.  *Gregg v. Georgia*, 428 U.S. 153, 173 (1976).  "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment."  *De'Lonta v. Angelone*, 330 F.3d 630, 633 (4th Cir. 2003) (citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)).   In order to state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants or their failure to act amounted to deliberate indifference to a serious medical need.  *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976).  "Deliberate indifference is a very high standard – a showing of mere negligence will not meet it. . . . [T]he Constitution is designed to deal with deprivations of rights, not errors in judgments, even though such errors may have unfortunate consequences. . . .  To lower this threshold would thrust federal courts into the daily practices of local police departments."  *Grayson v. Peed*, 195 F.3d 692, 695-96 (4th Cir. 1999).

Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed either to provide it or to ensure the needed care was available. *See Farmer*, 511 U.S. at 837. Objectively, the medical condition at issue must be serious. *See Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care). Proof of an objectively serious medical condition, however, does not end the inquiry.

The subjective component requires "subjective recklessness" in the face of the serious medical condition. *See Farmer*, 511 U.S. at 839-40. "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997). "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Virginia Beach Correctional Center*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer* 511 U.S. at 844). If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted." *See Farmer*, 511 U.S. at 844. Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *See Brown v. Harris*, 240 F.3d 383, 390 (4th Cir. 2000) (citing *Liebe v. Norton*, 157 F.3d 574, 577 (8th Cir. 1998) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken)).

Plaintiff claims that on three occasions in April of 2016, he suffered asthma attacks as a result of chemical agents being discharged on the unit where he was housed. ECF 35. Defendant Lt. James Smith, whom plaintiff accuses of denying him asthma medication, states in

a declaration under oath that he was never informed or aware that plaintiff required medical attention due to secondary exposure to pepper spray.  ECF 49 at Ex. 6, p. 2.  Because plaintiff never raised these alleged instances of denial of medical care by correctional staff for his asthma, the claim is unexhausted and must be dismissed.  *See* ECF 49 at Ex. 5, pp. 5-6, ¶ 1 (IGO complaint dismissed for failure to exhaust administrative remedy procedures).  Moreover, without notification of an ongoing problem managing his asthma because of the use of chemical agents in the housing unit, subjective knowledge of plaintiff's need for medical care cannot be attributed to these defendants.

4.   Denial of Psychological Care

There is no underlying distinction between the right to medical care for physical ills and its psychological and psychiatric counterpart.  *Bowring v. Goodwin*, 551 F.2d 44, 47 (4th Cir. 1977).  A prisoner is entitled to such treatment if a "[p]hysician or other health care provider, exercising ordinary skill and care at the time of the observation, concludes with reasonable certainty (1) that the prisoner's symptoms evidence a serious disease or injury; (2) that such disease or injury is curable or may be substantially alleviated, and (3) that the potential for harm to the prisoner by reason of delay or the denial of care would be substantial."  *Id.*  The *Bowring* Court further concluded that the aforementioned right to such treatment is based upon the essential test of medical necessity and not upon that care considered merely desirable.  *Id.* at 48.

Plaintiff attempted to address this matter in a complaint filed with the IGO, but the complaint was dismissed.  *See* ECF 49 at Ex. 5, p. 6, ¶ n (noting dismissal of complaint as beyond jurisdiction of IGO).  To the extent that exhaustion of administrative remedies does not apply to the subject matter of this claim, the merits are addressed below.

Defendants state that plaintiff requested psychological care on the following dates in 2016:  January 18; February 3 and 25; March 14, 15, and 29; April 3, 27, and 28; and May 1 and 3.  ECF 49 at Ex. 10, pp. 4-6, 8, 13-14, 16, 21, 23-26.  They further note that plaintiff was scheduled to meet with Defendant Weber on the following dates in 2016:  February 8; March 4, and 23; April 1 and 6; and May 4; but plaintiff refused to be seen on February 8 and May 4.  *Id.* at pp. 7, 9, 15, 20, 22, 27.  When plaintiff wrote a self-referral stating that he was having suicidal thoughts, he was placed on suicide watch where he could be monitored.  *Id.* at p. 20.  Weber noted after seeing plaintiff on April 6, 2016, that his reports of sadness and paranoia were not congruent with his presentation.  *Id.* at p. 22.  He noted his mood as euthymic, but easily agitated with no psychotic features observed.  *Id.*  Plaintiff did not present with any suicidal or homicidal ideations, nor did he exhibit any symptoms warranting referral to a psychiatrist as plaintiff requested.  *Id.*, *see also* p. 15 (consultation notes for March 23, 2016).

Plaintiff asserts in this court that he was diagnosed as bi-polar; however, in a handwritten note to the psychology department at WCI, plaintiff stated that he wanted an evaluation because he had "never been diagnosed with anything because [he had] never had serious psychology treatment or evaluation."  ECF 49 at Ex. 10, pp. 5–6, *see also* p. 3 (behavioral health segregation, initial assessment dated December 18, 2015; plaintiff denies psychiatric issues).   The note is date-stamped February 3, 2016, and Weber attempted to see plaintiff five days later on February 8, 2016, the day plaintiff refused to attend the interview.  *Id.* at p. 7.  Plaintiff was, however, seen for psychological consultation on later dates and was seen by a different psychologist, Dr. Vincent Siracusano.  He was evaluated by Siracusano on May 31, 2016, at which time plaintiff stated that he was doing well and did not need to be seen by psychiatry.  *Id.*

at p. 31.   Additionally, plaintiff was offered the opportunity to participate in group therapy sessions. *Id*. at p. 24.

While plaintiff asserts that he never refused an appointment with psychology staff, records submitted by defendants belie that assertion.   In a request form written in plaintiff's handwriting and dated March 29, 2016, plaintiff states that sessions with Weber are not helping and he accuses Weber of being a liar.  *Id*. at Ex. 10, p. 16.  Plaintiff further states that he does not want to visit with Weber anymore because Weber would not acknowledge plaintiff's mood swings and focused only on his anger and impulse control.  *Id*.  The claim asserted does not state an Eighth Amendment claim as it is "essentially a 'disagreement between an inmate and a physician over the inmate's proper medical care,' and we consistently have found such disagreements to fall short of showing deliberate indifference."  *Jackson v. Lightsey*, 775 F.3d 170, 178-79 (4th Cir. 2014) (quoting *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985); *see also United States v. Clawson,* 650 F.3d 530, 538 (4th Cir. 2011) (difference of opinion regarding the adequate course of psychiatric treatment does not give rise to Eighth Amendment violation).  Defendant Weber is entitled to summary judgment in his favor.

5.   Conditions of Confinement

Conditions that "deprive inmates of the minimal civilized measure of life's necessities" may amount to cruel and unusual punishment.  *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981).  However, conditions that are merely restrictive or even harsh "are part of the penalty that criminal offenders pay for their offenses against society."  *Id*.

> In order to establish the imposition of cruel and unusual punishment, a prisoner must prove two elements—that "the deprivation of [a] basic human need was *objectively* sufficiently serious," and that "*subjectively* the officials acted with a sufficiently culpable state of mind."

*Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995) (citation omitted).  "These requirements spring from the text of the amendment itself; absent intentionality, a condition imposed on an inmate cannot properly be called 'punishment,' and absent severity, such punishment cannot be called 'cruel and unusual.'"  *Iko v. Shreve*, 535 F.3d 225, 238 (4th Cir. 2008) (citing *Wilson v. Seiter*, 501 U.S. 294, 298-300 (1991)).

To establish a sufficiently culpable state of mind, there must be evidence that a known, excessive risk of harm to the inmate's health or safety was disregarded.  *See Wilson*, 501 U.S. at 298-99.  In other words, "the test is whether the guards know the plaintiff inmate faces a serious danger to his safety and they could avert the danger easily yet they fail to do so."  *Brown v. N.C. Dep't of Corr.*, 612 F.3d 720, 723 (4th Cir. 2010) (quoting *Case v. Ahitow*, 301 F.3d 605, 607 (7th Cir. 2002)).  Conduct is not actionable under the Eighth Amendment unless it transgresses bright lines of clearly-established pre-existing law.  *See Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992).

The objective prong of a conditions claim requires proof of an injury.  "[T]o withstand summary judgment on an Eighth Amendment challenge to prison conditions a plaintiff must produce evidence of a serious or significant physical or emotional injury resulting from the challenged conditions."  *Strickler v. Waters*, 989 F.2d 1375, 1381 (4th Cir. 1993).  "Only extreme deprivations are adequate to satisfy the objective component of an Eighth Amendment claim regarding conditions of confinement."  *De'Lonta*, 330 F.3d at 634.  Demonstration of an extreme deprivation proscribed by the Eighth Amendment requires proof of "'a serious or significant physical or emotional injury resulting from the challenged conditions.'"  *See Odom v. S.C. Dep't of Corr.*, 349 F.3d 765, 770 (4th Cir. 2003) (quoting *De'Lonta*, 330 F.3d at 634).

Plaintiff's claims regarding the conditions of his confinement involve allegations that he was housed in a cell on February 29, 2016, that did not have electricity and was provided only limited access to his personal property.  ECF 23-1 at p. 3.  Plaintiff further stated he was treated as a disciplinary segregation inmate, but was assigned to administrative segregation.  ECF 26 at p. 1.  Notwithstanding plaintiff's objection to his housing status, he later claimed that defendants violated this court's order by moving him from housing unit 4, the disciplinary segregation unit, to housing unit 3.  ECF 38 at p. 1.  In his declaration under oath, Lt. Smith explains that plaintiff was kept in housing unit 4 as an administrative segregation prisoner following this court's order to maintain plaintiff's current housing status.  ECF 49 at Ex. 6, ¶ 4.  Plaintiff was provided with "all of his property that is permissible in HU #4."  *Id.*  Smith further explains that plaintiff was not provided with certain items normally allowed for administrative segregation inmates because "inmates frequently pass items amongst themselves in HU #4."  *Id.*  Smith further states that he did not order the denial of phone calls, outdoor recreation, commissary, or book orders for the relevant time period.  *Id.*

In plaintiff's initial pleading filed in this court, he alleged that he was on administrative segregation and was going to be forced into general population despite dangers to his safety.  ECF 1.  Any misunderstanding as to the intent of this court's order is due to plaintiff's failure to be forthcoming about the true circumstances of his then-current housing status.  To the extent he was denied access to certain property or was not afforded other privileges that are afforded administrative segregation inmates, those conditions do not violate the Eighth Amendment.

With regard to plaintiff's claim that the staff alert cell he was confined to for four days in March of 2016 was filthy, contained no mattress, and was freezing, Smith asserts that "inmates frequently claim that staff alert cells resemble a dungeon."  ECF 49 at Ex. 6, p. 2, ¶ 7.  Smith

26

further states that this description of the staff alert cells is completely false; the cells are the same temperature as all other cells in housing unit 4; there are no bugs, rodents, or other pests in the cells; and the floors and walls are not smeared with urine and feces.  *Id*.  The staff alert cells, according to Smith, are cleaned and disinfected by special utility workers every time an inmate leaves.  *Id*.   Further, Smith states that plaintiff was provided with a mattress as well as socks, underwear, a t-shirt, and a jumper while confined to the staff alert cell.  *Id*. at ¶ 5.

Absent from plaintiff's claims is any objective evidence of a serious or significant physical or emotional injury resulting from his confinement on staff alert for four days.  The psychological injuries plaintiff claims are not borne out by the records produced by the psychology staff who interviewed plaintiff and had the opportunity to observe him.  Even though plaintiff reportedly suffered suicidal thoughts and was confined to suicide watch, subsequent evaluation revealed that his statements did not match his presentation and mood, leading to the conclusion that plaintiff was malingering.  Defendants are entitled to summary judgment on the claim regarding conditions of confinement.

A separate order follows.


January 26, 2017                             _____/s/_____
Date                                                     James K. Bredar
                                                             United States District Judge